IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SOLID Q HOLDINGS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>ARENAL ENERGY CORPORATION, RICHARD REINCKE, ERIC JOHNSON, BRIAN CHAPLIK, GUS SHOUSE, TOM BUIEL, and CHRIS COTA,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER DENYING MOTION TO DISMISS**<br><br>Case No. 2:15-cv-419-DN<br><br>District Judge David Nuffer |

Defendant Richard Reincke filed a Motion to Dismiss Case Based on Failure to State a Claim ("Motion")[1] against Plaintiff Solid Q Holdings LLC ("Solid Q") under rule 12(b)(6) of the Federal Rules of Civil Procedure on grounds that the instruments at issue are not "securities" as defined in the Securities Exchange Act of 1934. Because the instruments are "securities" under the Act for purposes of this Motion, the Motion[2] is DENIED.

## BACKGROUND

"To survive a motion to dismiss, a complaint must allege facts that, if true, state a claim to relief that is plausible on its face. A claim is facially plausible when the allegations give rise to a reasonable inference that the defendant is liable."[3] Accepting Solid Q's well-pleaded factual allegations as true, "view[ing] them in the light most favorable to" Solid Q,[4] and considering

---

[1] Docket no. 70, filed August 16, 2017.

[2] *Id.*

[3] *Mayfield v. Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2016) (citation and internal quotation marks omitted).

[4] *Id.*

also certain documents[5] in Solid Q's possession,[6] the relevant facts for purposes of this Motion are as stated below. However, no presumption of truthfulness is given to "bald assertions," legal conclusions, opinions, or deductions in the complaint—even if characterized as facts.[7]

Reincke is the chief operation officer of Defendant Arenal Energy Corporation ("Arenal"), a Texas corporation, which Reincke founded with Defendant Eric Johnson, Arenal's chief executive officer.[8] In June 2012, "an agent of Arenal," who is not a party to this case, met with Solid Q to present a "business proposal" involving "the possibility of [Solid Q] investing in Arenal."[9] During this meeting, the nonparty agent represented to Solid Q that Arenal "was about to go public within 30 days" "at $2 per share" but "needed $150,000 to finish up a few things prior to going public."[10] The nonparty agent also represented that Arenal "had proprietary products of high value, including an impressive patent-pending product that was highly valuable";[11] "had capped share issuance at 10,000,000 shares" so as not to dilute "any loan secured by Arenal's stock or any direct investment in Arenal stock";[12] and was working with certain individuals and organizations to promote its business.[13] Sometime after this meeting,

---

[5] *E.g.*, Exhibits to Declaration of Richard Reincke ("Declaration"), docket no. 71, filed August 16, 2017; Exhibit A to Reincke's Reply to Plaintiff's Opposition to Motion ("Exhibit to Reply"), docket no. 84, filed August 21, 2018; Exhibits 1 and 2 to Objection to Reincke's Reply to Plaintiff's Opposition to Motion ("Exhibits to Objection"), docket no. 87-1, filed August 27, 2018.

[6] *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) ("documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit" may properly be considered "[w]hen determining the sufficiency of plaintiffs' claim for Rule 12(b)(6) purposes." (citations omitted)).

[7] *In re Colonial Mortg. Bankers Corp.*, 324 F.3d 12, 15 (1st Cir. 2003); *In re Party City Secs. Litigation*, 147 F. Supp. 2d 282, 297 (D.N.J. 2001); *Kramer v. Van Dyke Pub. Schs.*, 918 F. Supp. 1100, 1104 (E.D. Mich. 1996).

[8] Complaint ¶¶ 2-4, docket no. 2, filed June 15, 2015.

[9] *Id.* ¶¶ 10-12, 47.

[10] *Id.* ¶¶ 12-14, 28.

[11] *Id.* ¶ 16.

[12] *Id.* ¶ 18.

[13] *Id.* ¶¶ 20, 22, 24, 26.

Solid Q contacted Reincke and Johnson, "and they confirmed all the representations made by [the nonparty agent], except they claimed that the public offering would be within 120 days."[14]

In reliance on these representations, Solid Q entered into a series of transactions with Arenal involving instruments denominated "promissory notes," and "ultimately lent Arenal $150,000.00."[15] The instruments accrued interest at a fixed rate of 15% per annum.[16] They were due in full within 180 days after execution.[17] They granted Solid Q the option to subscribe to stock by "convert[ing] all or any portion of the outstanding principal amount … and/or accrued and unpaid interest hereon into … shares of [Arenal's] Common Stock … at any time … [before] repayment or redemption in full … at a conversion price equal to $0.10 (ten cents) per share."[18] They were "collateralized by 1,500,000 shares of [Arenal's] common stock in the event of a breach."[19] And they were personally guaranteed by Johnson and Reincke.[20]

Arenal eventually defaulted on the instruments "and failed to make payments to [Solid Q] as agreed."[21] As a result, Arenal forfeited all shares of common stock that served as collateral.[22] This stock is now "worth significantly less than [what Solid Q] bargained for and was told" because Arenal "has no valuable assets" and "issued more than 10,000,000 shares without informing [Solid Q], which diluted [Solid Q's] shares."[23]

---

[14] *Id.* ¶ 36.

[15] *Id.* ¶¶ 51-52; *see* Exhibits A and F to Declaration, *supra* note 5.

[16] Exhibit A to Declaration, *supra* note 5, at 1.

[17] *Id.*

[18] *Id.* at 2-3; *see* Exhibit F to Declaration, *supra* note 5.

[19] Complaint, *supra* note 8, ¶¶ 73, 94; *see* Exhibit C to Declaration, *supra* note 5; Exhibit to Reply, *supra* note 5.

[20] Complaint, *supra* note 8, ¶ 56; *see* Exhibit B to Declaration, *supra* note 5.

[21] Complaint, *supra* note 8, ¶¶ 57, 62-63.

[22] *Id.* ¶¶ 58-59; *see* Exhibits to Objection, *supra* note 5.

[23] Complaint, *supra* note 8, ¶¶ 19, 29, 64, 80, 100.

"[A]s of today, Arenal is still not a public company."[24] It "now admits that it never had a patent-pending product."[25] And it also admits that the relationships it originally purported to have with certain individuals and organizations were actually limited, nonexistent, or never materialized.[26] If Solid Q had known this and other information regarding Arenal, Reincke, and Johnson, then Solid Q would never have agreed to loan any money to Arenal.[27]

Solid Q sued Arenal, Reincke, Johnson, and other Arenal officers or directors for violation the Securities Exchange Act of 1934 and state law.[28]

## DISCUSSION

Reincke seeks dismissal of Solid Q's claims on grounds that the instruments are not "securities" as defined in § 3(a)(10) of the Securities Exchange Act of 1934.[29] Section 3(a)(10)'s definition of "security" includes "any *note*, *stock*, [or] … any … *option* … on any security … (including any interest therein or based on the value thereof), … or any … right to subscribe to or purchase[] any of the foregoing."[30] In interpreting this definition, "form should be disregarded for substance and the emphasis should be on economic reality."[31] "Congress' purpose in enacting the securities laws was to regulate *investments*, in whatever form they are made and by

---

[24] *Id.* ¶ 15.

[25] *Id.* ¶ 17.

[26] *Id.* ¶¶ 21, 23, 25, 27.

[27] *Id.* ¶¶ 68, 78, 83, 98.

[28] *Id.* at 10-14.

[29] 15 U.S.C. § 78c(a)(10); *see* Motion, *supra* note 1, at 5.

[30] 15 U.S.C. § 78c(a)(10) (emphases added).

[31] *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967).

4

whatever name they are called."[32] Thus, the Supreme Court "ha[s] consistently identified the fundamental essence of a 'security' to be its character as an 'investment.'"[33]

### The instruments at issue are within the term "note" in § 3(a)(10).

To determine whether an instrument fits within the term "note" in § 3(a)(10) and is therefore a "security," courts apply the "family resemblance test" articulated in *Reves v. Ernst & Young*.[34] Under this test, an instrument denominated a note is presumed to be a "security" unless it "bears a strong resemblance" to one of the following categories of notes held not to be securities:[35]

> the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a "character" loan to a bank customer, short-term notes secured by an assignment of accounts receivable, … a note which simply formalizes an open-account debt incurred in the ordinary course of business[,] … [or] notes evidencing loans by commercial banks for current operations.[36]

Where—as here—an instrument is not sufficiently similar to one of these items, four factors are examined to determine whether another category should be added to this list.[37] First, the transaction is examined "to assess the motivations that would prompt a reasonable seller and buyer to enter into it."[38] Second, the plan of distribution of the instrument is examined "to determine whether it is an instrument in which there is 'common trading for speculation or

---

[32] *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990).

[33] *Id.* at 68.

[34] *Id.* at 67. The parties' reliance on the test stated in *SEC v. W. J. Howey Co.*, 328 U.S. 293 (1946), is misplaced, as the Supreme Court has expressly rejected application of that test to notes. *Reves*, 494 U.S. at 64.

[35] *Reves*, 494 U.S. at 67.

[36] *Id.* at 65 (citations and internal quotation marks omitted).

[37] *Id.* at 67.

[38] *Id.* at 66.

investment."[39] Third, "the reasonable expectations of the investing public" are examined.[40] And, fourth, "whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument" is examined.[41]

Examination of the first factor supports finding that the transactions here were intended to be investments. Arenal entered into these transactions for the purpose of raising money for its general business operations.[42] And—unlike the plaintiff in *Intelligent Digital Systems, LLC v. Visual Management Systems, Inc.*, which "merely sold assets" to a business[43]—Solid Q entered into these transactions to earn a profit in the form of interest which, although fixed, could be converted at Solid Q's option into common stock of Arenal at the rate of ten cents per share.[44] From both sides, then, these transactions are most naturally conceived as investments in a business enterprise rather than as purely commercial or consumer transactions.[45]

As to the plan of distribution, while the instruments were not traded on an exchange or actually "offered and sold to a broad segment of the public," they were expressly convertible at Solid Q's option into common stock of Arenal, which was to be publicly traded within 120 days.[46] "Common stock traded on a national exchange is the paradigm of a security …."[47] Under these circumstances, the fact that the instruments may have been sold only to Solid Q does

---

[39] *Id.* (citations omitted).

[40] *Id.*

[41] *Id.* at 67.

[42] Complaint, *supra* note 8, ¶ 14.

[43] 683 F. Supp. 2d 278, 284 (E.D.N.Y. 2010).

[44] Exhibit A to Declaration, *supra* note 5, at 1-2; *see Great W. Bank & Trust v. Kotz*, 532 F.2d 1252, 1257-58 (9th Cir. 1976) (explaining that a note may be a security where "the parties contemplate … conversion to stock").

[45] *See Reves*, 494 U.S. at 68.

[46] *Id.*; *see* Complaint, *supra* note 8, ¶¶ 14-15, 36; Exhibit A to Declaration, *supra* note 5, at 1-2.

[47] *Reves*, 494 U.S. at 69.

6

not take them outside the protection of federal securities laws.[48] Rather, the fact that the instruments "could be converted into … stock is a strong factor for holding that [they are] a security."[49]

The third factor—the public's reasonable perceptions—similarly supports concluding that these instruments are "securities." This is because the instruments gave Solid Q the option to convert all outstanding principal and interest into common stock of Arenal, which Reincke said would soon be publicly traded.[50] "[T]he public perception of common stock as the paradigm of a security suggests that stock, in whatever context it is sold, should be treated as within the ambit of the Act[]."[51] Under the circumstances, it would be reasonable for a prospective purchaser to view these instruments as securities. It would also be reasonable to take Reincke at his word.

Finally, there is no significant risk-reducing factor to suggest that the instruments are not "securities." Although the instruments are collateralized, they are collateralized by stock in Arenal[52]—and "stock is, as a practical matter, always an investment" subject to regulation under the Act.[53] Thus, rather than evidence the existence of another applicable regulatory scheme

---

[48] *Stoiber v. SEC*, 161 F.3d 745, 752 (D.C. Cir. 1998) ("Admittedly, the plan of distribution in part signals that the notes might not be securities, but that factor by itself is not dispositive.").

[49] *Leemon v. Burns*, 175 F. Supp. 2d 551, 559 (S.D.N.Y. 2001). Contrary to comments in *Intelligent Digital Systems*, 683 F. Supp. 2d at 285, the *Leemon* court's holding that the note in that case was a security was based solely on "[t]he fact that the Note's original principal could be converted into ADML common stock." *Leemon*, 175 F. Supp. 2d at 559.

[50] Complaint, *supra* note 8, ¶¶ 14-15, 36; Exhibit A to Declaration, *supra* note 5, at 1-2.

[51] *Reves*, 494 U.S. at 62.

[52] Complaint, *supra* note 8, ¶¶ 58, 73, 94; Exhibits A, C, and F to Declaration, *supra* note 5.

[53] *Reves*, 494 U.S. at 62.

rendering application of the Act unnecessary, the collateral in this case reinforces the Act's applicability.[54]

Based on the examination of the four factors identified in *Reves*, the instruments at issue are, for purposes of this Motion, within the term "note" in § 3(a)(10) and are thus securities. But they do not—as Reincke argues—fall within the Act's exception for notes with a maturity period of less than nine months.[55] That "exception applies only to commercial paper, defined by the Supreme Court as 'short-term, high quality instruments issued to fund current operations and sold only to highly sophisticated investors.'"[56] And the instruments in this case are not of that type.

### The instruments at issue are within the term "option" in § 3(a)(10).

Although *Reves* applies to instruments solely evidencing debt, the convertibility feature of the instruments in this case may in effect eliminate the need to examine these instruments under the "family resemblance test."[57] This is because, regardless of whether the instruments are within the term "note" in § 3(a)(10), they are squarely within its terms "option" and "right to subscribe to or purchase" an interest in stock.

Section 3(a)(10) "defines 'security' to include both 'any … option … on any security' and 'any … right to … [subscribe to or] purchase' stock."[58] Although the instruments in this case are denominated notes, they expressly grant Solid Q the option to convert all principal and

---

[54] *Cf. Rubin v. United States*, 449 U.S. 424, 429 (1981) (recognizing that "a loan secured by a pledge of shares of stock unmistakably involves a 'disposition of [an] interest in a security'" under the Securities Act of 1933).

[55] *See* 15 U.S.C. § 78c(a)(10).

[56] *SEC v. Wallenbrock*, 313 F.3d 532, 541 (9th Cir. 2002) (quoting *Reves*, 494 U.S. at 70); *see Holloway v. Peat, Marwick, Mitchell & Co.*, 900 F.2d 1485, 1489 (10th Cir. 1990) (the "exception for short-term notes is limited to prime quality negotiable commercial paper of a type not ordinarily purchased by the general public").

[57] *See Fletcher Int'l, Ltd. v. Ion Geophysical Corp.*, No. 5109-VCP, 2010 WL 2173838, *5 (Del. Ch. May 28, 2010).

[58] *Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc.*, 532 U.S. 588, 593 (2001) (quoting 15 U.S.C. § 78c(a)(10) (1994 ed., Supp. V)).

interest into Arenal stock. Accordingly, they fit within § 3(a)(10)'s terms "option" and "right to subscribe to or purchase" stock. They are, therefore, "securities" for purposes of this Motion.

## ORDER

THEREFORE, IT IS HEREBY ORDERED that the Motion[59] is DENIED without prejudice.

Signed October 23, 2018.

BY THE COURT:

David Nuffer
United States District Judge

---

[59] Docket no. 70, filed August 16, 2017.